# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MICHIGAN BELL TELEPHONE )
COMPANY, )
    Plaintiff/Cross-Defendant, )
                               )     No. 1:14-cv-416
-v- )
                               )     HONORABLE PAUL L. MALONEY
RACHEL EUBANKS, NORMAN J. SAARI, )
AND SALLY A. TALBERG, MICHIGAN )
PUBLIC SERVICE COMMISSIONERS, )
    Defendants/Counter-Defendants, )
                               )
    and )
                               )
SPRINT SPECTRUM, L.P., )
    Cross-Defendant/Counter-Plaintiff,)
_____)

## OPINION AND ORDER

    This matter is before the Court for a review of administrative actions taken by the Michigan Public Service Commission. For the reasons stated below, the Commission's determination must be affirmed in part and reversed and remanded in part.

### GENERAL LEGAL FRAMEWORK

    Congress enacted the Telecommunications Act of 1996, 47 U.S.C. § 152 *et seq.*, to mandate "that local service, which was previously operated as a monopoly overseen by the several states, be opened to competition." *MCI Telecomm. Corp. v. Bell Atl.*, 271 F.3d 491, 497 (3d Cir. 2001). Congress required the incumbent local exchange carriers to cooperate with competitive local exchange carriers to allow the CLECs to enter the market, either by connecting their equipment to the ILEC's existing network or by purchasing or leasing

existing network elements and services. *Id.* The ILECs and CLECs, through negotiation or arbitration, enter into "interconnection agreements," which set out the appropriate terms, rates, and conditions. *Id.* Congress directed the Federal Communications Commission (FCC) to promulgate implementing regulations, but gave oversight of the interconnection agreements to the state public-utility commissions. *Id.*

A party aggrieved by a determination in an interconnection arbitration may bring an action "in an appropriate Federal district court." 47 U.S.C. § 252(e)(6). Accordingly, there is "no doubt that federal courts have jurisdiction under § 1331 to entertain" claims that a state commission violated federal law in resolving issues under the Act. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642 (2002).

"When reviewing state public service commission orders under the Act, this [C]ourt is 'limited to determining whether the order is consistent with sections 251 and 252 of the Act.'" *Mich. Bell Tel. Co. v. MCI Metro Access Transmission Servs., Inc.*, 323 F.3d 348, 354 (6th Cir. 2003) (quoting *Mich. Bell. Tel. Co. v. Strand*, 305 F.3d 580, 586 (6th Cir. 2002)). This Court must "review the Commission's interpretation of the Act de novo . . ., according little deference to the Commission's interpretation of the Act." *Id.* However, "[w]ith respect to the Commission's findings of fact, [this Court] appl[ies] the arbitrary and capricious standard." *Id.* "The arbitrary and capricious standard is the most deferential standard of judicial review of agency action, upholding those outcomes supported by a reasoned explanation, based upon the evidence in the record as a whole." *Id.*

# ANALYSIS

## I. Michigan Bell Telephone's (AT&T Michigan's) Claims

### a. Claims I and II

The Michigan Public Service Commission (hereinafter the Commission) erred when it prematurely rejected the agreement between Sprint and Michigan Bell Telephone (hereinafter AT&T Michigan), and instead ordered those companies to submit an interconnection agreement that included the IP interconnection language the Commission preferred.

#### 1. Legal Framework

The Third Circuit has provided a helpful summary framework for 47 U.S.C. § 252:

> Section 252 sets out the process by which interconnection agreements between ILECs and CLECs are to be established. *See MCI*, 222 F.3d at 328; *GTE South*, 199 F.3d at 737. An incumbent and a requesting carrier may "negotiate and enter into a binding agreement." 47 U.S.C. § 252(a)(1). Such negotiations generally will begin with a request for interconnection by the CLEC. 47 U.S.C. § 252(a)(1). At any time during negotiations, either party may ask the state utility commission to participate in negotiations and mediate any differences. 47 U.S.C. § 252(a)(2). **The Act's clear preference is for such negotiated agreements.** *See Iowa Utils. I*, 525 U.S. at 405, 119 S. Ct. 721 (Thomas, J., concurring in part and dissenting in part). An agreement reached through negotiation need not conform to all the detailed, specific requirements of § 251; negotiation consequently bestows a benefit to those carriers able to resolve issues through negotiation and compromise. See *MCI Telecomm. Corp. v. U.S. West Commc'ns*, 204 F.3d 1262, 1266 (9th Cir. 2000); 47 U.S.C. § 252(a)(1). A negotiated agreement must merely be nondiscriminatory to a carrier not a party to the agreement and also be consistent with the public interest. *See* 47 U.S.C. § 252(e)(2)(A).

*MCI Telecomm. Corp.*, 271 F.3d at 500 (emphasis added).

Put simply, "[p]rivate negotiation . . . is the centerpiece of the Act." *Verizon North v. Strand*, 309 F.3d 935, 940 (6th Cir. 2002) (internal citation and quotation marks omitted).

When a dispute goes to arbitration, the Commission has a duty to make sure the requirements of § 251 are satisfied. *See* 47 U.S.C. § 252(e)(2)(B). However, the Act allows parties to *negotiate* binding terms "without regard to the standards set forth in subsections (b) and (c) of section 251." 47 U.S.C. § 252(a); *see* § 252(e)(2)(A) (describing that an agreement adopted by negotiation can only be rejected if it discriminates against a party not to the agreement or if it is contrary to the public interest).

### 2. Background

The procedural context in which this case arises is fairly complex.

After unsuccessful initial negotiations, several unresolved issues between the parties were submitted for binding arbitration. The Commission facilitates so-called "baseball arbitration," where both parties submit proposals, and the Commission chooses one.

The Commission preliminarily adopted Sprint's proposal for mandatory IP interconnection, the primary disputed issue in this case. Accordingly, the Commission ordered the parties to file a final ICA that reflected the terms as arbitrated.

However, after several extensions of time to file a final proposed interconnection agreement, the parties negotiated different terms with respect to TDM and IP interconnection, and filed a joint submission in a new docket number.

The filing included the following relevant language:

> Pursuant to Sections 251 and 252 of the Act, Sprint and AT&T Michigan engaged in good faith negotiations for an interconnection agreement. Portions of the Agreement were completed as a result of these negotiations.

The remaining portions were adopted by arbitration in MPSC Case No. U-17349, in which the Commission directed AT&T Michigan and Sprint to submit an agreement conforming to the December 6, 2013 Commission Order in that case (the "Arbitration Order"). A copy of the Agreement is submitted with this joint submission as Exhibit A.

Sprint and AT&T Michigan hereby further notify the Commission that

(a) The parties have arrived at a contingent resolution of the issue that was designated as Issue I in MPSC Case No. U-17349;

(b) Pursuant to such contingent resolution, the Agreement submitted herewith does not include the language for IP-to-IP Interconnection proposed by Sprint for Issue 1 in that case but, instead, includes the following language in the General Terms and Conditions:

*311.2.2 All traffic that Sprint exchanges with AT&T Michigan pursuant to this Agreement will be delivered in TDM format.*

*3.11.22.1 Nothing in this Agreement, including the foregoing section 3.11.2.2, shall be construed to prohibit the Parties from agreeing that Sprint may exchange traffic with AT&T Michigan pursuant to a separate agreement, and nothing herein prohibits Sprint from exchanging traffic with AT&T Michigan in IP format pursuant to such an agreement.*

and

(c) If the contingency upon which the parties' resolution of Issue 1 depends is not fulfilled, the parties may, on or about July 15, 2014, submit for MPSC review pursuant to section 252(e)(2)(B) of the Telecommunications Act of 1996, an amendment to the ICA building, as arbitrated language, the language for IP-to-IP Interconnection proposed by Sprint for Issue 1 in Case No. U-17349, and providing for the deletion of the language set forth above.

(ECF No. 23-7 at PageID.2290–91.)

The Commission issued an order rejecting the proposed agreement on March 18, 2014. (*See* ECF No. 23-27 at PageID.2484.) The Commission took issue with the proposed

language on "Issue 1" above, which was the only language to stray from the arbitration order.[1] The Commission's order is not a model of clarity, but the Court distills two reasons that the Commission rejected the language. Both were legally erroneous.

### 3. Analysis

> *i.   The MPSC unlawfully rejected the portion of the agreement adopted by negotiation after arbitration by using the substantive standards for arbitration.*

First, the Commission held, at least implicitly, that because it had already favored Sprint's language in arbitration and believed that § 251 required IP interconnection, the parties were not free to negotiate otherwise. (*See id.* at PageID.2487 ("In its December 6, order, the Commission found that under Section 251(c)(2) of the FTA, AT&T Michigan must provide Sprint with IP-to-IP interconnection. . . . *Accordingly, the Commission finds that the parties must file*, for Commission approval or rejection, *the agreement* by which AT&T Michigan shall provide Sprint *with IP-to-IP interconnection*." (emphasis added)), PageID.2489 ("Sprint Spectrum L.P. and AT&T Michigan shall submit an *internet protocol-to-internet protocol interconnection agreement for Commission approval* . . . .") (emphasis added)).)

However, the Act contemplates that parties may and should "participate further in the negotiations," even after arbitration. *See* § 252(b)(5). Indeed, the failure "to continue to negotiate in good faith," even after unresolved issues are submitted to arbitration, is forbidden by the Act. *See id.* To hold that parties may not subsequently negotiate after

---

[1] The proposed agreement was otherwise consistent with arbitration in all respects.

arbitration, but before the final approval stage, would be inconsistent with the statutory language, purpose, and relevant regulations. *See id.*; 47 C.F.R. § 51.807(h) ("**Absent mutual consent of the parties to change any terms and conditions adopted by the arbitrator**, the decision of the arbitrator shall be binding on the parties." (emphasis added)); *see also Verizon North*, 309 F.3d at 935 ("Private negotiation . . . is the centerpiece of the Act."); *In the Matters of Deployment of Wireline Servs. Offering Telecomm. Capability*, 14 F.C.C.R. 20912, 20982, 1999 WL 1124073, at ¶ 158 (F.C.C. 1999) ("We reiterate here our conclusion . . . that state arbitration of interconnection agreements will be expedited and simplified by a clear statement of terms that must be included in every arbitrated agreement, *absent consent to different terms.*") (emphasis added)).

An "agreement" is not, in fact, "submitted for approval" until *after* arbitration occurs. *See* 47 U.S.C. § 252(e)(1) ("Any interconnection agreement *adopted* by negotiation or arbitration *shall be submitted for approval.*"). Thus, once parties submit an agreement that reflects both negotiated and arbitrated language, a commission must either "approve or reject the agreement." But it "may only reject" "an agreement (or any portion thereof) adopted by negotiation" if it makes certain factual findings under § 252(e)(2)(A); and it may only reject "an agreement (or any portion thereof) adopted by arbitration" if it makes separate factual findings under § 252(e)(2)(B). A commission may not find that a portion of an agreement "adopted by negotiation" that was "submitted" is inconsistent with the statutory section that only applies to a portion of an agreement "adopted by arbitration," even if the parties negotiate after arbitration and mutually "submit" an agreement that does not perfectly mirror "terms and conditions [previously] adopted by the arbitrator." *See* 47 C.F.R. § 51.807(h).

Moreover, a final agreement that contains both negotiated and arbitrated terms is not at all unusual; the Commission carries separate responsibilities in evaluating "an agreement (*or any portion thereof*) adopted by negotiation" and "an agreement (*or any portion thereof*) adopted by arbitration"), as the statutory language provides and case law reflects. *See* § 252(e)(2) (noting the State Commission's separate duties to evaluate negotiated versus arbitrated language); *see also, e.g., Indiana Bell Tel. Co., Inc. v. McCarty*, 30 F. Supp. 2d 1100, 1102 (S.D. Ind. 1998) ("The IURC . . . approved the parties' final agreement, which contains a mix of negotiated and arbitrated terms.").

Since the parties were permitted to negotiate after arbitration but prior to any agreement being "submitted for approval," 47 U.S.C. § 252(e)(1), and the parties agreed to other language, the Commission should have analyzed the final negotiated language under the negotiation, and not arbitration, standard. Thus, it was no longer the Commission's place to evaluate, as it did (*see* ECF No. 23-27 at PageID.2487–2489), whether the "portion" of the agreement "adopted by negotiation" met "the requirements of section 251." *Compare* 47 U.S.C. § 252(e)(2)(A) *with* § 252(e)(2)(B); *see* 47 C.F.R. § 51.3 ("[A] state commission shall have authority to approve an interconnection agreement adopted by negotiation even if the terms of the agreement do not comply with the requirements of this part."). And thus, the Commission could only determine whether the "portion" of the agreement "adopted by negotiation" either 1) "discriminate[d] against a telecommunications carrier not a party to the agreement" or 2) "[wa]s not consistent with public interest, convenience, and necessity." 47 U.S.C. § 252(e)(2)(B).

Accordingly, the Commission's first ground for rejecting the proposed ICA—that it had already decided that IP interconnection was mandatory, and the parties therefore had to comply with that determination—was unquestionably legally erroneous.

The Commission, however, rejected the negotiated language in part on one other ground. Even if the Commission errantly rejected the agreement in part under the substantive arbitration standard, it argues it was justified because the parties did not file separate language referenced in the agreement in violation of a filing requirement under § 252(e)(1).

> ii. *The MPSC unlawfully rejected the portion of the agreement adopted by negotiation by ordering its own language submitted rather than simply enforcing the filing requirement.*

For the reasons detailed above, the Court has already found that since parties are allowed to negotiate and present an agreement or partial agreement after arbitration, the operative standard for the MPSC was to analyze whether the negotiated language met the requirements of § 252(e)(2)(A) rather than § 252(e)(2)(B). The Commission's second reason for rejecting the agreement (and ordering its own language submitted) was that the parties allegedly failed to fully comply with a filing requirement mandated under § 252(e)(1). As it turns out, the Commission's concerns about the filing requirement were well-founded, and the parties should have been required to file the contingent resolution agreement.

The question, though, is whether failing to fully follow a filing requirement by omitting separate language referenced in the portion of the negotiated agreement constitutes sufficient grounds to reject the agreement and *order other language in its place*—without allowing the parties to cure the filing defect. On this point, statutory interpretation principles lead to the conclusion that a mere omission in filing referenced language in a negotiated agreement,

absent any bad faith, is not sufficient grounds to reject the agreement and order other language in its place, at least prior to the parties being given the chance to cure the defect.

Whether an agreement is adopted by means of voluntary negotiation or arbitration, it "shall be submitted for approval to the State commission." 47 U.S.C. § 252(e)(1). This "filing requirement" has been broadly construed, particularly in cases involving negotiation, because a state commission must adequately determine whether it must approve or reject an agreement under its statutory mandate. *See, e.g., In the Matter of Qwest Commcn's Int'l Inc. Petition for Declaratory Ruling on the Scope of the Duty to File and Obtain Prior Approval of Negotiated Contractual Arrangements under Section 252(a)(1)*, 17 F.C.C.R. 19337, 19342, 2002 WL 31204893 (F.C.C. 2002) (holding that any "agreement that contains an ongoing obligation relating to section 251(b) or (c) must be filed under section 252(a)(1)").

Once a *complete agreement* is submitted, "[a] State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies." 47 U.S.C. § 252(e)(1). Those "deficiencies" that warrant "rejection," however, are confined to two categories, depending on whether an "agreement (or any portion thereof)" was "adopted by negotiation" or "adopted by arbitration." *Id.* § 252(e)(2).

"[A]n agreement (or any portion thereof) adopted by negotiation" may only be rejected if the Commission finds that: 1) "the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement," or 2) "the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity." *Id.* § 252(e)(2)(A).

As to the first permissible ground for rejection, the Commission clearly had no basis to find that the complete agreement (or portion thereof) discriminated against another telecommunications carrier because it lacked the referenced language to evaluate.

Likewise with the second ground. The Commission could not conclude that *the implementation* of the agreement was inconsistent with the public interest because it had not seen the full contours of the implementation.[2]

In short, the Commission collapsed its duties. Rather than simply enforcing the filing requirement by ordering the referenced resolution language to be publicly filed, as it undoubtedly had the authority to do, the Commission rejected the proposed agreement, including the negotiated language, and ordered its own preferred language (as it found required previously under § 251) to be filed.[3]

Perhaps the contingency was an anti-competitive ghoul, seeking to scare away other competition; perhaps the contingency was innocuous. To this day, no one knows what was contained in this resolution, which is an ironic consequence of the Commission's order. There is no evidence in the record, however, that the contingent resolution language

---

[2] The Commission half-heartedly advances a related alternative argument that its actions were justified because the parties did not comply with a procedural rule that provides the MPSC with approval authority over proposed settlements. The Commission's argument that it did not even realize the proposed language constituted a settlement fails because both parties urged the Commission to approve the negotiated language. In this vein, the parties' decision to file the new proposed agreement in a different docket number makes sense. Even if the procedural rule was not followed, it would not excuse the Commission from violating the Act. A state commission is not allowed to create procedural rules that are contrary to the substantive federal law that governs the proceedings. *Cf. Strand*, 309 F.3d at 940. The substantive law only allows the Commission to reject negotiated language for two grounds, as the Court has discussed. *See* 47 U.S.C. § 252(e)(2)(A).

[3] An analogous example in federal court would be a district court denying a motion to approve a settlement agreement *with prejudice* because the parties did not initially include the full language of the settlement agreement, ordering the parties to submit a new agreement with the court's own preferred language instead, and refusing to give the parties a chance to cure the defect by filing the complete agreement.

reflected bad faith or an intent to "eviscerate[] Section 252." (*See* ECF No. 23-27 at PageID.2489.)

As one court put it in a similar context: "Without access to all terms and conditions, the [Public Utility Commission of Texas] could make no adequate determination of whether the provisions fulfilling § 251 duties are discriminatory or otherwise not in the public interest." *Sage Telecomm., LP v. Public Utility Comm'n of Texas*, 2004 WL 2482672, \*7 (W.D. Tex. Oct. 7, 2004) (holding that the ILEC and CLEC "must publicly file all such terms for approval by the State commission" and remanding the action to the PUC for further determinations).

A filing requirement is certainly "in the public interest," in one sense, and consistent with the Act; however, a commission "may only reject" negotiated language if it, in fact, "*finds the . . . implementation of such agreement or portion* is not consistent with the public interest, convenience, and necessity . . . ." 47 U.S.C. § 252(e)(2)(A)(ii) (emphasis added). It was without sufficient information to make any "adequate [factual] determination." *See Sage Telecomm.*, 2004 WL 2482672, at \*7.

In sum, the Commission did not have sufficient information to determine whether the negotiated agreement could be rejected under § 252(e)(2)(A), and its second ground for rejecting the negotiated language fails.

        *iii.*     *Sprint's waiver and mootness arguments fail, and AT&T Michigan is still entitled to an appropriate remedy.*

The Michigan Public Service Commission did not find, and had no basis to find, that the negotiated TDM language in the ICA the parties filed was discriminatory or contrary to the public interest. Sprint does not argue as such.

Despite having urged the Commission to honor the parties' agreement, Sprint now argues that AT&T "lost the ability to challenge" the decision because "[t]he parties voluntarily changed positions to react to a filing requirement that had been imposed, and thereby abandoned the previously negotiated contingent resolution and proposed TDM language." Sprint treads closely to the judicial estoppel line with this argument, but in any event, the argument is without merit. AT&T Michigan did not "voluntarily" change positions. Both parties acquiesced to the Commission's forceful demands—and risked hundreds of thousands of dollars in fines if they had not done so.

Sprint also argues that AT&T's claim is "moot" in large part because the Court cannot "put the parties back where they would have been" if the Commission had approved the TDM language as the law required. While turning back the clock is often practically difficult, that does not mean AT&T's claim is legally "moot." Indeed, if that were the case, nearly every party satisfied with a decision by a state commission could argue that an aggrieved party's remedy would be disruptive and therefore any claim would be moot.

AT&T Michigan merely needs to satisfy Article III standing and be an "aggrieved party" under 47 U.S.C. § 252(e). Federal courts have overturned state commission decisions in dozens of cases, and Sprint does not point to a single one that required a party to

demonstrate anything special to be "aggrieved"; not including agreed-upon language in a final product sufficed to aggrieve AT&T Michigan (and for that matter, Sprint), and AT&T Michigan is entitled to a remedy. Failing to cite to a single case for this argument is curious because "[t]he heavy burden of demonstrating mootness rests on the party claiming mootness." *Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003).

Admittedly, the specific contingent resolution the parties reached is, in one sense, factually moot because the dates in that resolution have long since passed. Still, the difficulty of fashioning a *remedy* does not render AT&T's *claim* legally moot because it remains aggrieved by the Commission's decision. *See In re Swedeland Dev. Grp.*, 16 F.3d 552, 560 (3d Cir. 1994) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)) ("[If] a court can fashion '*some* form of meaningful relief,' even if it only partially redresses the grievances of the prevailing party, the appeal is not moot."); *cf. In re Thorpe Insulation Co.*, 677 F.3d 869, 881 (9th Cir. 2012) ("To say that a party's claims, although diligently pursued, are equitably moot because of the passage of time, before the party had a chance to present views on appeal, would alter the doctrine to be one of 'inequitable mootness.'").

The appropriate remedy here is to put the parties back in a "negotiating position," just as they were prior to the Commission's unlawful order. Accordingly, the parties must be given a window of time in which to negotiate new language, contingent or otherwise, and submit *all* language to the Commission for approval **under the appropriate standard.** This matter will be remanded to the Commission, which will afford the parties thirty (30) days in which to jointly submit new language with respect to interconnection. If the parties submit negotiated language, they must fully comply with the filing requirement under § 252(e)(1).

### b. Claim III

Since the Court has fashioned an equitable remedy for Counts I and II that places the parties back into a "negotiation position" prior to the Commission's unlawful order rejecting the parties' negotiated language and requiring the parties to include IP interconnection language, the Court need not, as CenturyLink (*amicus curiae*) notes, decide whether, and if so how, § 251(c)(2) applies to IP interconnection. (*See* ECF No. 30 at PageID.2756.) Of course, if the parties failed to negotiate new language, and the Commission once again ordered mandatory IP interconnection language, AT&T Michigan would have the right to appeal to this Court for a follow-up determination.

### c. Claim IV

AT&T Michigan next argues the Commission erred by requiring AT&T to provide entrance facilities at TELRIC, or cost-based, rates for traffic that does not involve AT&T end-users.

"Entrance facilities," also known as "transmission facilities" (usually wires or cables), "are used for both interconnection and backhauling." *Talk America, Inc. v. Mich. Bell. Tel. Co.*, 564 U.S. 50, 66 (2011). Generally, an ILEC must provide entrance facilities for *interconnection* at cost-based rates, but not backhauling.

The relevant FCC regulation defines "interconnection" as "the linking of two networks for the *mutual exchange of traffic.*" 47 C.F.R. § 51.5 (emphasis added).

The Supreme Court has noted that § 251(c)(2) mandates that ILECs "provide . . . interconnection" in order to "ensure[] that customers on a competitor's network can call customers on the incumbent's network, and vice versa." *Talk America, Inc. v. Mich. Bell.*

*Tel. Co.*, 564 U.S. 50, 54 (2011); thus, "when used for the mutual exchange of traffic," entrance facilities "fall comfortably within the definition of interconnection." *Talk America, Inc.*, 564 U.S. at 63 (citing 597 F.3d at 388 (Sutton, J., dissenting)).[4]

"Backhauling," on the other hand, "does not involve the exchange of traffic between incumbent [ILEC] and competitive [CLEC] networks." *Talk America, Inc.*, 564 U.S. at 55 n.2 (2011). And "[b]ecause entrance facilities are used for backhauling and interconnection purposes, the FCC effectively eliminated only unbundled access to entrance facilities for backhauling purposes . . . ." *Id.*[5]

In order to "make the interconnection requirement as inexpensive for new entrants as possible,' the FCC requires that ILECs charge the CLECs certain cost-based rates, known as 'TELRIC rates' for the use of certain of their facilities," including interconnection. *Indiana Bell Tel. Co., Inc. v. Stephan*, 2017 WL 1129954, at *1 (S.D. Ind. Mar. 27, 2017) (quoting *SprintCom, Inc. v. Comm'rs of Ill. Commerce Comm'n*, 790 F.3d 751, 753–54 (7th Cir. 2015)).

The Court finds Judge Chang's analysis in another similar case persuasive:

What *is* in dispute is whether the Act compelled the ICC to order AT&T to provide cost-based rates for the use of the facilities involved in interconnection

---

[4] More generally, though, "interconnection arrangements may be used for local telephone service but not for long-distance services." *Id.* at 66 n.6 (citing 47 C.F.R. § 51.305(b) ("A carrier that requests interconnection solely for the purpose of originating or terminating its interexchange traffic on an incumbent LEC's network and not for the purpose of providing to others telephone exchange service, exchange access service, or both, is not entitled to receive interconnection pursuant to section 251(c)(2) of the Act.")).

[5] The FCC also affirmed in its amicus brief before the Supreme Court in *TalkAmerica*, that cost-based facilities are to be "provided *solely* for interconnection under Section 251(c)(2)," and can no longer be used "more expansively" by CLECs for other purposes." (ECF No. 23-5 at PageID.1970 (emphasis added).) "[E]ntrance facilities must be made available for interconnection at cost-based rates even though they need not be made available at cost-based rates for other purposes." (*Id.* at PageID.1963.) And the Illinois and Florida commissions have both rejected the notion that TELRIC-based entrance facilities may be used to transport traffic between a CLEC and an IXC.

of certain indirect traffic. *See generally Pac. Bell Tel. Co. v. Cal. Pub. Utils. Comm'n,* 621 F.3d 836, 842 (9th Cir. 2010) (explaining the role of entrance facilities in interconnection). Sprint argues that cost-based access to facilities must be made without limitation to who the end-users are because § 251 provides that all telecommunications providers have the duty to "interconnect directly or *indirectly*." Sprint Br. at 6 (citing 47 U.S.C. § 251(a)). In support of its position, Sprint relies on a recent decision by the Second Circuit, affirming that "carriers have the right to interconnect to exchange traffic that does not originate or terminate on their own networks." *S. New England Tel. Co. v. Comcast Phone of Conn., Inc.,* 718 F.3d 53, 63 (2d Cir.2013) ("*SNET* ") (citing FCC Opinion and Order, 22 F.C.C.R. 3513 (2007)). Emphasizing that "nothing in the language of § 251 suggests that the interconnection duty relates only to the transmission and routing of traffic between a [competitor's] and the [incumbent's] end-users," the Second Circuit explained that given the pro-competition goals of the Act and the importance of third-party transit traffic, indirect interconnection was just as essential. *Id.* at 63; *accord Qwest Corp. v. Cox Neb. Telcom, LLC,* No. 08 CV 3035, 2008 WL 5273687, at *3 (D. Neb. Dec. 17, 2008) ("The clear language of Section 251 requires [incumbents] to directly interconnect with competitors and facilitate competitors' ability to indirectly interconnect.").

An important detail about this analysis, however, is that it concerns indirect interconnection involving competitors only—that is, where a competitor (in this case Sprint) transits a call through an incumbent (such as AT&T) in order to reach another *competitor* in the same exchange area. *See, e.g., Ill. Bell Tel. Co. v. Box,* 526 F.3d 1069, 1071 (7th Cir.2008) (describing traffic "from the customers of one [competitor] to the customers of another, using the [incumbent's] circuits as intermediaries"). For its part, AT&T does not appear to contest that this type of indirect traffic is TELRIC–eligible; rather, AT&T argues that it is still consistent with FCC rules to deny Sprint access to interconnection facilities at cost-based rates where they would be used to exchange traffic with an interexchange carrier, which is a long-distance carrier operating *outside* the exchange area. AT&T Resp. Br. at 45. Sprint contends that the logic of *SNET* extends to any situation in which the incumbent is the middleman, whether that incumbent is interconnecting traffic from a competitor to a competitor, or from a competitor to an interexchange carrier, and vice versa. R. 62, Sprint Reply Br. at 2–3.

The Court disagrees. Based on the statutory language of the Act and supporting regulations, a state commission may properly draw a distinction between the local traffic of interconnection of competitor-bound calls and the long-distance traffic of interexchange-carrier-bound ones. *See Talk Am., Inc.,* 131 S. Ct. at 2265 n.6 ("Interconnection arrangements may be used for local telephone service but not for long-distance services.") (citing 47 C.F.R. § 51.305(b)). Section 251(c)(2) mandates that incumbents must provide interconnection "for the transmission and routing of telephone exchange service and exchange access." 47 U.S.C. § 251(c)(2)(A). "Telephone exchange service" is defined as "service *within* a telephone exchange, or within a connected system of telephone exchanges *within* the same exchange area," and exchange access as the "offering of access" thereto. 47 U.S.C. §§ 153(20), (54) (emphases added). Thus, the interconnection duty as articulated by the Act applies only in the context of local traffic *within* exchange areas, as distinct from interexchange traffic.

*SprintCom, Inc. v. Scott*, 2014 WL 6759714, at *3–4 (N.D. Ill. Dec. 1, 2014).[6]

The Court agrees—to the extent the language as adopted by the Commission allows Sprint to use AT&T's facilities to send traffic to or from some third-party interexchange carrier, the language has gone much too far.

There is simply no way to justify the Commission's (and Sprint's) position: When Sprint uses AT&T as an intermediary to transport traffic to or from an *interexchange carrier*, there is no "exchange of traffic" within the meaning of the regulations. *See* 47 C.F.R. § 51.5. An ILEC cannot be forced to provide interconnection, let alone at TELRIC-based rates, for such interexchange purposes. *See* 47 C.F.R. § 51.305(b) ("A carrier that requests interconnection solely for the purpose of originating or terminating its interexchange traffic on an incumbent LEC's network and not for the purpose of providing to others telephone

---

[6] Other circuit decisions seem to comport with Judge Chang's analysis. *See, e.g., Puerto Rico Tel. Co., Inc. v. SprintCom, Inc.*, 662 F.3d 74, 80 (1st Cir. 2011) ("Interconnection allows customers of one LEC to call the customers of another . . . .").

exchange service, exchange access service, or both, is not entitled to receive interconnection pursuant to section 251(c)(2) of the Act."); *see also SprintCom*, 790 F.3d at 757 (citing 47 C.F.R. § 51.305(b) ("Sprint . . . interprets the provision to mean that the converse must be true—that as long as it's not using the interconnection *solely* for interexchange traffic it's entitled to TELRIC rates for all traffic. There's no basis for that interpretation.").

\* \* \*

However, unlike in *Scott*, AT&T Michigan here at least appears to contest the conclusion that "where a competitor (in this case Sprint) transits a call through an incumbent (such as AT&T) in order to reach another *competitor* in the same exchange area," "this type of indirect traffic is TELRIC-eligible." *Scott*, 2014 WL 6759714, at \*3–4; (*see* ECF No. 52 at PageID.3151 (asserting AT&T must only provide TELRIC-priced interconnection facilities for traffic that involves AT&T end users)).[7]

The Court must reject AT&T's broader position here—one that it has apparently not taken in prior cases, *see* Scott, 2014 WL 6759714, at \*3–4—to the extent it advocates for an "end-user" requirement.

The statutory source for TELRIC rates is found in 47 U.S.C. § 252(d). *See SNET*, 718 F.3d at 56 n.1 (citing 47 U.S.C. § 252(d)) ("TELRIC rates are based on the cost to the supplier, are determined without reference to a rate-of-return and may include a reasonable

---

[7] Frustratingly, the parties repeatedly make statements in their briefs, such as "the issue here is not . . ." (ECF No. 52 at PageID.3156), "AT&T agrees" (*id.* at PageID.3152), "[t]his is not in dispute," (ECF No. 34 at PageID.2817), and "Sprint agrees" (*id.*), "the MPSC agrees" (ECF No. 36 at PageID.2882). The lack of clarity on this issue is disappointing. The Court is left to wonder whether the parties even understand one another's positions on this issue. Since AT&T urges an "end-user" distinction, at least in its heading, the Court addresses the propriety of TELRIC-based rates for traffic between CLECs that utilizes AT&T's facilities.

profit."). That section confines itself to 47 U.S.C. § 251(c)(2). *See* 47 U.S.C. § 252(d) (defining the appropriate scope of the "[d]eterminations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment *for purposes of subsection (c)(2) of section 252 of this title*" (emphasis added)).

In turn, § 251(c)(2) lists the "[a]dditional obligations of incumbent local exchange carriers," and references "[t]he duty to provide, for the facilities and equipment of any requesting telecommunications, interconnection with the local exchange carrier's network . . . for the transmission and routing of telephone exchange service and exchange access."

In turn, again, "telephone exchange service" is defined in the relevant regulations as:

(1)  A service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge; or

(2)  A comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service.

47 C.F.R. § 51.5

The Court is convinced that when reviewing the statutory and regulatory sections in their entirety and the general purposes of the Act, a commission is not precluded from requiring an ILEC to provide indirect interconnection and "transit" service at TELRIC-based rates. Thus, the Court finds the Second Circuit's analysis in *SNET* persuasive, at least to an extent.

AT&T Michigan has read "the mutual exchange of traffic" too narrowly under these circumstances. The relevant regulation does not state "the mutual *benefit* of traffic," it states "the mutual *exchange* of traffic." *See* 47 C.F.R. § 51.5. Likewise, the relevant regulation does not state "the mutual exchange of *calls*," but rather, "*traffic*." *See id.* If the definition of the regulation was given the treatment that AT&T Michigan advocates for, § 251(a)(1) would make no sense because "interconnection indirectly," *id.*, through AT&T Michigan does not mutually *benefit* AT&T Michigan or necessarily involve AT&T's end users.

Put simply, "nothing in the language of § 251 suggests that the interconnection duty relates only to the transmission and routing of traffic between a CLEC and the ILEC's *end users*." *SNET*, 718 F.3d at 63 (emphasis added). Moreover, AT&T Michigan points to no dispositive guidance from the FCC, which only further bolsters this Court's conclusion that a commission is permitted to reject an end-user partition in the context of TELRIC-priced facilities. *See S. New England Tel. Co. v. Perlermino*, 2011 WL 1750224, at *5 (D. Conn. May 6, 2011), *aff'd*, *SNET*, 718 F.3d at 53; *see also SNET*, 718 F.3d at 59 n.3 ("At least sixteen state commissions in addition to the DPUC have exercised their regulatory authority under the Act to determine that ILECs must provide transit traffic service at regulated rates.").

Admittedly, the relevant regulation states that "[i]nterconnection is the linking of two networks for the mutual exchange of traffic," and "[t]his term does not include the transport and termination of traffic." 47 C.F.R. § 51.5. However, "the *transmission and routing* of telephone exchange service and exchange access," is required under the plain language of 47 U.S.C. § 251(c)(2)(A). *See SNET*, 718 F.3d at 63 (citing § 251(c)(2)(A)) ("Without transit

service, the indirect interconnection between two CLECs could not be used 'for the transmission and routing of telephone exchange service and exchange access.'").

Thus, the *transport* and termination of traffic under 47 C.F.R. § 51.5 and the requirement for *transit* service implicit under 47 U.S.C. § 251(c)(2)(A) and § 251(a) are distinct. *See Qwest Corp. v. Cox Neb. Telcom, LLC*, 2008 WL 5273687, at *11 (D. Neb. Dec. 17, 2008) ("While this Court was correct in finding that interconnection does not generally include the transport of traffic, an ILEC's obligation to provide transit service is an exception to the general rule.").[8]

Finally, while AT&T Michigan argues that *Ohio Bell Tel. Co. v. Public Utils. Comm'n of Ohio*, 711 F.3d 637 (6th Cir. 2013) supports its position—that the Second Circuit "conflat[ed] sections 251(a)(1) and 251(c) in [a] manner inconsistent with . . . *Ohio Bell Tel. Co.*—the Court disagrees.

In *Ohio Bell Tel Co.*, the Sixth Circuit actually rejected AT&T's argument that "'Section 251(a) simply does not apply' to an incumbent carrier subject to Section 251(c)." *Id.* at 642. AT&T Michigan's argument here is a corollary to that rejected argument. While true, "Sections 251(a) through (c) create a 'three-tiered hierarchy of escalating obligations based on the type of carrier involved,'" *id.* (internal citation omitted), "Section 251 clearly

---

[8] Because the fees at issue in this claim are merely the pricing of entrance facilities—and not the fee for the transport and termination of telephone calls—this Court's conclusion is consistent with *Talk America*. *See Talk Am.*, 564 U.S. at 63 ("Compensation for transport and termination—that is, *for delivering* local telephone calls placed by another carrier's customer—is governed by separate statutory provisions and regulations." (emphasis added)); *compare* 47 U.S.C. § 252(d)(1) *with* § 252(d)(2).

imposes *greater* interconnection burdens on incumbent carriers," including "the additional obligations set forth under Section 251(c)." *Id.* at 643.[9]

Thus, it makes no sense to require a state commission divorce the obligation of indirect interconnection and transit service in § 251(a) from TELRIC-based rates in § 251(c) and § 252(d). *See SNET*, 718 F.3d at 59 n.3 ("At least sixteen state commissions in addition to the DPUC have exercised their regulatory authority under the Act to determine that ILECs must provide transit traffic service at regulated rates.").

Accordingly, the Commission's decision in this regard is reversed in part and remanded. On remand, the parties shall propose language to the Commission that consistently reflects this Court's holding: the current definition must be reformed to the extent it permits Sprint to use TELRIC-priced entrance facilities to exchange traffic with an interexchange carrier; nonetheless, the Commission is not required to only permit Sprint to use TELRIC-priced entrance facilities to exchange traffic with AT&T's *end users.*[10]

### d.    Claim V

AT&T finally argues that the Commission erred by effectively permitting AT&T to only charge Sprint 50% of the TELRIC rate for entrance facilities. The Commission's decision in this respect finds no support in federal law.

---

[9] AT&T Michigan's assertion: "[t]he Sixth Circuit . . . has made clear that these provisions have independent force, such that some interconnection duties may arise under section 251(a) but not section 251(c)" does not reflect the Sixth Circuit's holding as to *ILECs*. It's more accurate to say that "the interconnection duties [that] arise under section 251(a) but not section 251(c) [also apply to ILECs]" because "Section 251 clearly imposes *greater* interconnection burdens on incumbent carriers." *See Ohio Bell Tel.*, 711 F.3d at 643; *cf. Mich. Bell Tel. Co.*, 597 F.3d at 387 (Sutton, J., dissenting) ("Who wants a local phone service that connects customers to just a handful of other individuals in the community?").

[10] If this Court's holding on the latter issue—rejecting AT&T's end-user position—inconsistently reflects AT&T's position or does not fit with the Commission's baseball arbitration methods on remand, any party may file a motion for reconsideration on this ground within fourteen days.

Under the FCC's binding regulations, an ILEC's rates for "interconnection, and methods of obtaining interconnection" "shall" be established pursuant to the TELRIC methodology. 47 C.F.R. § 51.501, 51.503.

Sprint and the Commission advance several justifications, none of which has any merit. The Court is comfortable resting on the cogent response to each argument in AT&T's reply brief. (*See* ECF No. 52 at PageID.3157–61.)

"The Supreme Court has described the TELRIC rate as being just above the confiscatory level." *Bellsouth Telecomm. V. Ky. Pub. Serv. Comm'n*, 693 F. Supp. 2d 703, 7005 (E.D. Ky. 2010) (citing *Verizon Commc'ns v. FCC*, 535 U.S. 467, 489 (2002)). How the Commission could justify shifting one-half of a rate "just above the confiscatory level" remains a mystery. "TELRIC rates are based on the *cost to the supplier*, are determined without reference to a rate-of-return any may include a *reasonable profit*." *SNET*, 718 F.3d at 56 n.1 (emphasis added). Sprint neither incurs *costs* as a supplier nor remains entitled to any *reasonable profit*.

Accordingly, the Commission's decision is reversed and remanded on this claim. On remand, the Commission must permit AT&T to lease its property at the full TELRIC rate.

### e. Claim VI

Finally, AT&T advanced a sixth claim, but it provided no briefing in support of this claim. The Complaint alleges the Commission's decision not to consider one brief addressing IP interconnection provisions and a supporting affidavit was arbitrary and capricious. Since the claim has been waived, this Court need not address it.

## II.     Sprint's Cross-Claims

Since Sprint's cross-claims lack merit, the Court must affirm the Commission's decision with respect to both claims.

### a.     Cross-claim I

Sprint first argues that the Commission erred when it allowed AT&T Michigan to collect access charges when the calling party is not billed a separate "toll" charge by Sprint.

Under the FCC's compensation regime adopted in 2011, access charges are allowed (at least for a transition period) for calls that meet certain definitional requirements. The first cross-claim turns on those requirements.

An MTA is a large wireless license area, and the FCC has treated IntraMTA wireless calls akin to landline calls made within a single local exchange. Both mobile-to-land and land-to-mobile calls fall into separate categories: IntraMTA calls and InterMTA calls. The treatment of IntraMTA calls, however, is not in dispute in this case.

Calls that originate and terminate in different MTAs, referred to as "InterMTA" calls, are in dispute. According to Sprint, InterMTA calls can constitute either "toll" calls, or "non-toll" calls. That may be true as a billing matter, but AT&T cites ample authority rejecting Sprint's position.

In *Global NAPS, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 98 (2d Cir. 2006), the Second Circuit rejected the argument that long-distance traffic is exempt from access charges if a carrier "imposes no separate toll charges." That argument was "beside the point" because "what really mattered in determining whether an access charge was appropriate was whether a call traversed local exchanges, not how a carrier chose to bill its customers." *Id.*

Similarly, in *Line Systems, Inc. v. Nextel Corp.*, 2012 WL 3024015, *4 (E.D. Pa. July 24, 2012), the Court rejected Sprint's argument "that its decision not to charge its customers separate fees means that Line Systems does not provide Sprint 'exchange access.'" *Id.* "Sprint's billing methods," were again, "'beside the point,' because '[t]he type of phone call, not Sprint's approach to charging its customers, controls." *Id.* (quoting *GlobalNAPS*, 454 F.3d at 98. The Court deferred to the FCC's "distinction between interMTA and intraMTA calls," under which "[i]nterMTA calls . . . are subject to tariff-based access charges." *Id.*

In fact, Sprint does not cite a single case in support of its contention, instead relying upon past, irrelevant MPSC decisions and twisting FCC regulations to their breaking point. It would be odd indeed if the FCC simply allowed access charges to be dictated solely by whether the using carrier charged its customers or not. Sprint's argument is, once again, "beside the point." *Id.*

### b.     Cross-claim II

Sprint next argues that the Commission erred by ordering Sprint to shoulder the cost of non-recurring (one-time) charges because the Commission found that "because Sprint is the cost-causer, it should be solely responsible for the nonrecurring costs in interconnection orders because AT&T Michigan incurs costs for work it performs."

This claim is essentially a corollary of AT&T's fifth claim.

As the Court has observed: rates for transport and termination under § 251(b)(5) and rates for interconnection under § 251(c)(2) are distinct. "[T]he transport and termination of traffic' is subject to different regulatory treatment than interconnection," as "[c]ompensation for transport and termination—that is, for delivering local telephone calls placed by another

carrier's customer—is governed by separate statutory provisions and regulations" than the "fee for interconnection." *Talk Am.*, 564 U.S. at 63.

Thus, Sprint's attempt to cite "bill-and-keep" principles (that the FCC adopted for § 251(b)(5)) to support cost-sharing for non-recurring, or interconnection costs, is misplaced. The regulations still require that interconnection be priced at TELRIC, and not based upon bill-and-keep. Indeed, the relevant FCC bill-and-keep order states that "[w]e have the statutory authority to establish bill-and-keep as the default compensation arrangement for all traffic *subject to section 251(b)(5)*." *See CAF Order*, ¶ 769 (emphasis added). Accordingly, for "non-recurring" interconnection charges, at a minimum, the Commission did not violate the law when it ordered Sprint to pay the whole package.

## ORDER

For the reasons stated in the accompanying opinion, the Court hereby **AFFIRMS IN PART** and **REVERSES IN PART** the Michigan Public Service Commission's administrative decision below. This action is remanded for proceedings not inconsistent with this opinion.

Judgment will enter separately.

**IT IS SO ORDERED.**

Date:  July 10, 2017                                       /s/ Paul L. Maloney
                                                                  Paul L. Maloney
                                                                  United States District Judge